The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,   )
                                 )
 4           Plaintiff,          )
                                 )          Case Number
 5                v.             )
                                 )      1:22-cr-184-TWT-CMS-1
 6   FELIKS MEDVEDEV,            )
                                 )
 7           Defendant.          )
     _____)
 8

 9

             Transcript of a detention hearing before
10
             the Honorable Russell G. Vineyard
11
                    May 3, 2023; 1:35 p.m.
12
                       Atlanta, Georgia
13

14   Appearances:

15   For the Plaintiff:     CHRISTOPHER J. HUBER
                            RADKA T. NATIONS
16                          Assistant U.S. Attorneys
                            United States Courthouse
17                          75 Ted Turner Drive, SW, Suite 600
                            Atlanta, Georgia  30303
18

19   For the Defendant:     KISH LAW LLC
                            BY:  PAUL S. KISH, ESQ.
20                          229 Peachtree Street NE, Suite 2505
                            Atlanta, Georgia  30303
21

22        Proceedings recorded by FTR Gold digital recording,
     transcript produced by computer.
23   _____

24              Diane Peede, RMR, CRR, CRC
                  Federal Official Court Reporter
25            75 Ted Turner Drive, SW, Suite 2194
                  Atlanta, Georgia  30303-3309
```

<pre>
 1                     P R O C E E D I N G S

 2              (Call to the order of the Court.)

 3              THE COURT:  Please be seated.

 4              Would you swear in our interpreter, please.

 5              THE COURTROOM DEPUTY:  You do solemnly swear that

 6    you shall well and truly act as the interpreter in the matter

 7    that has come before the Court, so help you God?

 8              THE INTERPRETER:  I do.

 9              EKATERINA ALEKHIMA-HUMPHREY, SWORN TO INTERPRET

10    FROM ENGLISH TO THE RUSSIAN LANGUAGE AND FROM THE RUSSIAN

11    LANGUAGE TO ENGLISH

12              THE COURTROOM DEPUTY:  Please be seated.  And state

13    your name for the record.

14              THE INTERPRETER:  My name is Ekaterina

15    Alekhima-Humphrey.  I can spell it for you.

16              THE COURTROOM DEPUTY:  Please.

17              THE INTERPRETER:  The first name,

18    E-k-a-t-e-r-i-n-a.  The last name is two words,

19    A-l-e-k-h-i-m-a-Humphrey, H-u-m-p-h-r-e-y.

20              THE COURT:  Thank you for being here this

21    afternoon.

22              This is the case of the United States of America

23    versus Feliks Medvedev, Case Number 1:22-cr-184.

24              We're here for a hearing on the Government's motion

25    for detention.
</pre>

1    Mr. Huber and Ms. Nations are here, on behalf of

2   the United States.

3    Mr. Kish, on behalf of Defendant Medvedev.

4    Am I pronouncing his name correctly, Mr. Kish?

5    MR. KISH:  Yes, sir.

6    THE COURT:  All right.  Mr. Kish, are you ready to

7   proceed?  I know you've recently been retained.  Are you

8   ready to proceed?

9    MR. KISH:  I've been retained.  I would like to

10   enter a limited appearance.  I'm fairly certain I'll be in

11   the case beyond today, but things have moved very quickly,

12   and so I'd like to have that ability, if I could do that, for

13   today, Judge.

14    THE COURT:  All right.  Are you ready to proceed

15   today for the detention hearing?

16    MR. KISH:  We are ready to proceed today.

17    THE COURT:  All right.

18    Mr. Huber.

19    MR. HUBER:  Thank you, Your Honor.  Before I get

20   into the motion for detention, I just wanted to put on the

21   record that we did file the consular notifications with both

22   Ukraine and Russia, sent those notifications on Friday, after

23   the initial appearance.

24    THE COURT:  All right.

25    MR. HUBER:  But as Your Honor stated, we're here

today for a detention hearing for Mr. Medvedev, and we were
going to proceed by proffer at this point.

       The only argument we're making is that there's a
significant risk of non-appearance.  We're not arguing a
threat to the community or a danger to the community, but,
rather, that there's no set of conditions that would assure
Mr. Medvedev's appearance at any trial or a subsequent
sentence should he be convicted.

       He's a Russian citizen.  He's a citizen -- he has a
passport from the Ukraine as well.

       He is seeking United States citizenship.  He's
filed an application.

       His wife and two children also are -- have Russian
passports.  They are United States citizens.  His wife and
his two children, I believe, are both -- are all three United
States citizens.  Mr. Medvedev is not.  All do have Russian
passports.  And Mr. Medvedev has access to substantial
assets.

       Although I've been informed that it may not be
accurate, in November of last year Mr. Medvedev filed a
declaration of financial support with the U.S. Citizenship
and Immigration Services seeking to sponsor a Ukrainian
citizen or resident to come to the United States and live
with him.

       And in connection with that -- that filing last

November, Mr. Medvedev filed a personal financial statement,
and that's what's been marked as Government Exhibit 1A.  I
believe Your Honor has a copy, and I've provided a copy to
Mr. Kish as well.

       And you can see on the first page of that personal
financial statement that Mr. Medvedev submitted to the United
States Government in November of 2020 -- the statement itself
is dated April of 2020, but it was submitted in November.
You can see that he claims total assets of --

       THE COURT:  Of 2020 or 2022?

       MR. HUBER:  2022.  Excuse me, Your Honor.  2022,
yes.

       Total assets of $8.8 million.

       And then on page 2, you can see that he claims to
have gold, which is a subset of the $8.8 million, gold worth
$5 million.  That's a -- that's a sub -- a subset of the 8.8,
not in addition to.

       There's -- in conversations with Mr. Kish, there's
a suggestion that perhaps the number -- the financial
statement was made up to support the application and it is
not accurate.

       I'm not sure that is helpful for Mr. Medvedev, that
he would submit false documents to the United States
Citizenship and Immigration Services to try to support a
foreign national to come to the United States.

1          We do have a signed, you know, application under

2    penalty of perjury, is the application that says he's worth

3    $8.8 million about five months ago.

4          We do -- we also have records that show at least a

5    one-time purchase of approximately $690,000 worth of gold.

6          And as alleged in the Indictment, part of Mr.

7    Medvedev's scheme was actually to purchase gold in Singapore.

8    The Indictment alleges that Mr. Medvedev moved over

9    $160 million worth of money through bank accounts he

10   controlled in the Northern District of Georgia.

11         Those accounts were created through twelve

12   companies that Mr. Medvedev started here in Georgia and

13   registered with the Secretary of State in Georgia.  Those

14   companies are essentially fictitious companies.  There's no

15   indication of actual business.

16         Their bank accounts -- all those bank accounts show

17   is the transfer in and transfer out of these 160-plus million

18   dollars.

19         Most of those funds originated outside the United

20   States, arriving from multiple countries, including Russia,

21   Singapore, Austria, Thailand, the U.A.E., China, Germany,

22   Hong Kong, among others.

23         And then the outgoing funds, again over

24   $160 million of outgoing money, going to multiple countries,

25   including the Czech Republic, Israel, Singapore, Hungary,

1    Bulgaria, and Turkey.

2            And of that 160-plus million dollars, we've been

3    able to trace $65 million of it to Singapore, where it was

4    sent to buy gold bullion from the Singapore Precious Metals

5    Exchange, which is the same place that Mr. Medvedev purchased

6    his $690,000 worth of gold.

7            It's our understanding from an interview that Mr.

8    Medvedev --

9            THE COURT:  Hold on just a minute.

10           Is the interpreter --

11           THE INTERPRETER:  Oh, yeah.  Oh, yeah.  We're

12   catching -- we're all caught up.

13           MR. KISH:  We're okay, Judge.

14           THE COURT:  Okay.

15           THE INTERPRETER:  Oh, yeah.

16           THE COURT:  Okay.

17           THE INTERPRETER:  We are.

18           MR. KISH:  Thank you, though.

19           THE COURT:  I just wanted to make sure.

20           Okay.  Mr. Kish, get my attention --

21           THE INTERPRETER:  No, no, no.  I'm making notes.

22           THE COURT:  Okay.

23           THE INTERPRETER:  Thank you.

24           THE COURT:  I'm sorry, Mr. Huber.

25           MR. HUBER:  No, no, not at all.  So I can't see.

1    So if, yeah, I need to slow down or stop --

2            THE INTERPRETER:  We're okay.

3            MR. HUBER:  But it's our understanding from an

4    interview with Mr. Medvedev that occurred Friday morning that

5    he was -- and from documents we've seen, he was in

6    communication with an individual in Russia, in Moscow, about

7    these funds, these incoming funds and what he was supposed to

8    do with those funds.

9            The bank account that Mr. Medvedev opened here in

10   north Georgia, he controlled, but he also provided access to

11   Russians to -- and you can see that from the I.P.

12   addresses -- that did transactions on these bank accounts.

13   You can see that those I.P. addresses -- some of those I.P.

14   addresses are traced to Russia.  Some of the transactions

15   were undertaken by Mr. Medvedev.

16           He has continuing connections with Russia.  So he

17   has those ongoing communications about this $160 million of

18   foreign money.

19           He also traveled to Russia multiple times between

20   2015 and 2021, stating that he was traveling to Moscow to

21   visit relatives.  I think he traveled five or more times to

22   Russia between 2015 and 2021.

23           And the fictitious companies he created here in

24   Georgia had multiple Russians as officers.  And Exhibit 2,

25   which I think Your Honor also has and has been provided to

Mr. Kish, shows some of the Secretary of State filings that were made.  And in particular, what it -- so it's a subset of the twelve companies that were either -- that are either still in good standing with the state or were dissolved sometime in 2022 or 2023.

And so K.S.K. International, which is the first company you see, has Mr. Medvedev as the registered agent, and it has an officer, who's the C.E.O., C.F.O. and secretary, whose name is Eduard Sarkisov, and his address, as you can see, is Moscow, Russia.  That's on page 1 of Exhibit 2.

On page 2 of Exhibit 2 is the registered -- is an information submitted for Dashingstar PTE.  Again, Mr. Medvedev is the registered agent.  And you can see the C.E.O. listed for Dashingstar is Anton Luksha.  I'm not sure if I'm pronouncing that right, but who's also in Moscow.

Page 3 is Elnox Trading PTE.  That, too, has Mr. Medvedev as the registered agent and as the C.E.O., and it lists Mikhail Gulianin as the C.F.O. and secretary, who is also in Moscow.

All of those companies are still in good standing with Georgia, and all have current officers who are in Russia, in Moscow.

Then we have Mablestine, which is the next page. That was dissolved in January of this year, January of 2023,

but at the time of this registration, you can see it was
dated January 19th of 2023, at the top.

It has, again, Mr. Medvedev listed as the
registered agent and as the C.E.O., and then has Eduard
Sarkisov again listed as the C.F.O. and secretary.

Gredstone PTE, which is the next document -- next
page -- excuse me -- was dissolved in August of 2022, so a
few months ago.  But at the time of this filing, it had Mr.
Medvedev as the C.E.O., and then Aleksander Kalinin,
K-a-l-i-n-i-n, as C.F.O. and secretary, from Russia,
Orehovo-Zuevo, Russia.

And then, finally, Albequipment Trading, which was
also -- which dissolved in January of 2022, had Mr. Medvedev
as the C.E.O., and then Ivan Dorofeev as the secretary and
C.F.O., also in Russia.

So he has ongoing contacts with Russia.  He has
substantial -- substantial financial reserve -- money,
$160 million of money coming into accounts he controls.

And there's -- even if he surrenders his passport,
his Russian passport, his Ukrainian passport, his U.S.
passport, there's nothing we can do to stop him from getting
another Russian passport almost as soon as he walks out of
the court.

His entire family has Russian passports.  If he
were to flee, there's nothing that would stop him or would

allow us to get him back from Russia.  Russia would -- does not extradite to the United States.

Essentially, if he's not detained, we don't -- there's no guarantee that the day before trial, the day before sentencing, he wouldn't decide that he has a better bat in Russia instead of here, and flee with his family.

And I know we're going to hear some -- some sad facts about his family.  It's my understanding his wife is very ill with cancer, and he has two children who are both under 18.

None of this -- we're not -- not doing this because of those -- those, but, rather, recognizing that even given that situation with his family, there's no set of conditions that the Court can impose that will assure that Mr. Medvedev does in fact report for a trial, report for a sentence, given his access to substantial financial resources and continued interaction with multiple individuals in Russia.

I'm happy to answer any questions, Your Honor.

THE COURT:  I don't know what you're prepared to tell me more than I could read from the Indictment or what you've shared already, but if there's anything more about the nature of the offense that I should know about in making a decision. . .

MR. HUBER:  So we have -- so I -- we have not been able to determine the ultimate origin of a lot of the funds

1   that are coming into Mr. Medvedev's accounts, particularly

2   the foreign money.

3           We do believe and understand that at least some

4   money is coming from the United States, some domestic money

5   is flowing into Mr. Medvedev's account.  That money is coming

6   from illegal -- an illegal gambling ring in the Midwest, in

7   Texas, that is also associated in some way with Russians.

8           And then the money going out -- as I said, a lot of

9   the money is going out.  We have been able to trace that

10  to -- about a third of it to the Singapore Precious Metals

11  Exchange, and it is -- when it's leaving the country, it is

12  returning to the control of multiple Russian nationals.

13          THE COURT:  Okay.  Thank you for --

14          MR. HUBER:  I think -- yeah, I don't want to

15  necessarily talk any more about some of the information we

16  have beyond that.

17          THE COURT:  Okay.  Thank you, Mr. Huber.

18          MR. HUBER:  Thank you.

19          THE COURT:  Mr. Kish.

20          MR. KISH:  Yes, Judge.  Thank you.

21          We're going to go on a current events and history

22  tour here in order to understand the position we're making on

23  the Government's motion for detention without bail.

24          And remember, as we know, as the professionals in

25  the room all know, the question here is whether the

1   Government can fulfill its burden of convincing the Court --

2   because this is not a presumption case -- of convincing the

3   Court that there are no conditions whatsoever that can be

4   crafted that would otherwise assure that Mr. Medvedev would

5   show up for court.

6         We know that there's a war right now between Russia

7   and Ukraine.  We know from current events that in 2014,

8   Russia annexed -- the west says illegally, Russia says not

9   illegally -- the Crimean peninsula.

10         Mr. Medvedev was born there, in Crimea, which at

11   the time he was born there was the old Soviet Union, and then

12   it became Ukraine, now it's Russia.

13         He was born in Stevastopol, the largest city there.

14         He was raised there.  He, as shown in the Pretrial

15   Services Report, got his undergraduate degree there, and then

16   he immigrated to the United States in 2007, where he has

17   lived ever since.

18         As the presentence -- the Pretrial Services Report

19   demonstrates, Mr. Medvedev lives in the Buford area, where he

20   and his family have lived for many years, with his wife, Inna

21   Gurina, and their two children.

22         Their youngest child was born in the United States

23   and has U.S. citizenship by virtue of that fact.

24         Their older child has derivative citizenship when

25   Inna Gurina became a United States citizen in 2021.

1    It's interesting to me, Judge -- and I'm picking up

2  the facts in this case on the fly, so to speak, but it is my

3  understanding that the Defendant, Mr. Medvedev, applied for

4  his U.S. citizenship at the exact same time as did his wife,

5  but that that application has interestingly been delayed and

6  delayed and delayed, to the point where Mr. Medvedev had to

7  hire counsel.  And there's currently an ongoing case in this

8  district, I believe assigned to Judge Ross, of a request for

9  action from the U.S. Immigration or the U.S.C.I.S. for action

10  on that situation.

11    So it certainly looks to me that the possibility is

12  that the United States has delayed action on his citizenship

13  application because of the investigation in this case.

14    Now, that doesn't undercut a lot of what the

15  Government said, which is that Russian -- former Russian or

16  Ukrainian citizens, whatever they are when they're from

17  Crimea, can still hold a Russian passport.  But I think it's

18  quite possible that but for this investigation, my client

19  would be a U.S. citizen today.  And I can't make that claim

20  definitively, but I think the facts are out there that show

21  this.

22    Next, the Pretrial Services Report also

23  demonstrates that Mr. Medvedev is the owner of a business.

24  It's a music school in the Buford area that he runs with his

25  wife.  It's a long-standing school.  It's been around for 15

or 20 years.

Mr. Medvedev and his wife -- his wife is a music instructor as well, and they hire other music teachers to teach people music.  That's what a music school does.  It is one of the main sources of the family's income.

The -- the family has another business.  There's a situation in which Mr. Medvedev began a Car Cash Title business in which he has arrangements with several local used car dealers where they basically fund the loan for when someone goes in to purchase a used car vehicle.

Mr. Medvedev is -- again, has that corporation. It's a limited partnership, I should say, which is in his name.  The relationships are with three car dealerships I've verified exist here.  One is called Wolfgang's in Buford. Another is Easy To Affordable in Roswell.  And the third is Carma Auto, I believe in the Duluth area.

There are bank accounts that I'm sure the Government investigators found when they searched the family's residence, as well as doing their preliminary work, related to that entity.

The school has bank accounts here.  Mr. Medvedev has bank accounts here, as does his wife.

The family's current residence is a piece of rental property.  Their monthly rent is approximately $2,500 per month.

1    The family pays approximately $1,300 a month in
2  auto loan payments for vehicles that Mr. Medvedev and his
3  wife both drive.
4    They have the usual utility payments.
5    But other than that, the only other major asset
6  they own is a piece of property that Ms. Gurina purchased in
7  2021.  I looked it up.  It's in Gwinnett County.  It was
8  listed, the purchase price in the Gwinnett County records, as
9  $235,000 back in 2021.
10    It is a piece of raw land that is in a developing
11  area, it looked to me like from the Zillow and the other
12  sources that I encountered.  And so it seems to have some
13  kind of value that is fairly substantial, which, obviously,
14  Ms. Gurina is willing to pledge if the Court thinks some
15  security is needed.
16    Ms. Gurina has got stage 4 bone cancer.  Their
17  children, as you can see from the Pretrial Services Report,
18  are twelve and nine.
19    The only relative that Mr. Medvedev has in the
20  United States is his mother, who is a retired sales woman,
21  and she lives in Las Vegas with her new husband.
22    Mr. Huber pointed out that there is an application
23  that was submitted, Government's Exhibit 1, to the U.S.
24  Immigration -- or Customs and Immigration Services several
25  months ago in which Mr. Medvedev falsely claimed to have a

bunch of assets.

Mr. Huber and I have discussed this.  That application was for Mr. Medvedev's father.

They're in a war zone.  They were trying to get his father and his father's two young daughters -- or a daughter and a son, I should say, who are in Stevastopol, they are trying to get them out.

So we concede that my client lied about having all these assets so that he would appear to be a more financially stable person in order to see if he could get his father and his half-siblings out of what is essentially a war zone.

And, again, that's a fact that, as Mr. Huber said, does cut partly against the position that we're taking, but I think it's also somewhat explained by current events in the last year about why people will take desperate steps to try to protect their family members in this situation.

It sort of didn't matter for Mr. Medvedev's father, who died six weeks ago.  And so he has his two half-siblings over there, and he doesn't know where they are right now and what their situation is.

Mr. Medvedev, as I said, is accused in the Indictment here of essentially opening up a series of bank accounts into which money was deposited from certain people, and then the money was sent out of the bank accounts and a portion of the money was used, apparently, to purchase gold.

1          But the Indictment, to me the most interesting

2     thing about it was the fact that it said out of the 150 or

3     $160 million, less than $500,000 was retained by Mr.

4     Medvedev.

5          I will proffer to the Court that my understanding

6     is the vast majority of that money was used to pay for

7     expenses related to these various corporations that are

8     outlined in Government's Exhibit 2, things like yearly

9     accounting statements.  There's an accountant who is

10    providing statements for each of these entities, other fees

11    and things associated with that.

12         My reading -- again, I only have seen the

13    Indictment.  I haven't seen any of the other information that

14    might support that.  My reading is that this is a case

15    exactly what it says in the Indictment.  My client's accused

16    of money laundering based on the underlying felony of not

17    having a license for transmitting money.

18         There's no allegations in the Indictment that the

19    source of any of these funds are otherwise illegal, gambling

20    rings or otherwise.

21         Instead, what I've heard the Government focus on

22    again and again and again in its presentation is the word

23    "Russia;" that some of the other people whose names are on

24    the documents are from Russia; that my client is originally

25    from Russia, which at the time was Ukraine, but now is,

according to the Russians, Russia.

　　　　　Again, Mr. Huber is right.  The United States does not have the ability, most likely, to have a person returned if that person flees to Russia.

　　　　　But let's get real here.  This is a family man whose wife is dying of bone cancer.  In the last 48 hours, every time I've tried to communicate with her, I have to work around her cancer treatments.

　　　　　They have two kids at home.  They have two small businesses they're trying to run, which simply cannot run if this man is held without bail.

　　　　　We don't -- on the defense side, we don't have significant assets to pledge.  Again, my client lied about having assets in an effort to get his family out of a war zone.  We concede that.

　　　　　But I have to believe that there are conditions we can create which would assure that Mr. Medvedev will show up when he's supposed to.

　　　　　One of the things that -- that Mr. Huber alluded to but did not go into further, I think is something the Court should consider.

　　　　　So far as I've been able to determine, Mr. Medvedev was completely unaware that he was under investigation until the usual, in a white-collar case, hoard of armed federal agents descended on this family in the early morning hours,

1    scared the bejesus out of them, and had them all at gunpoint
2    up against the wall.
3            Mr. Medvedev cooperated.  He answered questions,
4    and it's my understanding he provided information which
5    seemed to match up with what the investigators have found
6    over the years.  He didn't deny anything.  He spoke with them
7    at length.
8            He offered to provide additional information, and
9    we made that offer to the Government recently and we're still
10   in discussions about that.
11           I think when we put all of those facts together, I
12   think it demonstrates something that is not quite the same as
13   what Mr. Huber proffered to the Court, which is a man who's
14   charged for the first crime in his life, apparently, because
15   we've never seen anything about a prior criminal record, with
16   a non-violent crime, where he cooperated when first
17   confronted, where his wife is dying of cancer, he has minor
18   children, they're willing to pledge whatever assets they do
19   have in order to secure his release, and we are more than
20   willing to comply with any reasonable electronic monitoring
21   the Court might think is appropriate, monitoring of his
22   person, monitoring of all of his Internet and cell phone
23   activity, other than attorney-client privileged
24   communications, obviously.  But we're willing to agree to
25   anything so that this man can be allowed to get with his

1    family and figure out how we're going to respond to these

2    allegations.

3            I think that, again, the Government's point is

4    valid that that the Government -- that the U.S. Government

5    has a difficult, if not impossible, time of getting someone

6    back if that person flees to Russia.

7            But if we require that not only the Defendant but

8    his entire family surrender their passports and considering

9    the circumstances, I think that is an incredibly unlikely

10   circumstance under this set of facts.

11           It's not an easy case.  I'll grant you that, Judge.

12   But I think that when we get back to cases that are

13   difficult, the thing to remember is which party has the

14   burden of proof.

15           To me, I just don't see that the Government has

16   fulfilled that burden under all of these circumstances, and

17   we would ask you to deny the Government's request for

18   detention without bond and to set bail with reasonable

19   conditions that can assure the Court that Mr. Medvedev, that

20   he'll be where he's supposed to be.

21           THE COURT:  Mr. Kish, you may not be able to answer

22   these questions, but, obviously, one of the big concerns to

23   me is what sort of resources he does have available.

24           I mean, I have this document that he's submitted

25   under oath, and you're telling me it's an admitted false

1  statement.  It's quite a whopper of a false statement.

2  That's what I'm struggling with is, why do you have to

3  estimate that kind of wealth on a document to get support?

4          And I'll hear from Mr. Huber about this, but is

5  there anything that you would like to tell me about what his

6  actual --

7          MR. KISH:  Sure.

8          THE COURT:  -- resources are?

9          And I saw the 500,000.  There's a lot of money that

10 passed through, but 500,000 --

11         MR. KISH:  Right.

12         THE COURT:  -- seemed to be his fee.  So what can

13 you tell me, other than the property?

14         MR. KISH:  Okay.  The wife has the property.  Let's

15 call it two to three hundred thousand dollars in value.

16         They have these two cars, which they're paying on,

17 so that really has no value.

18         They -- the ongoing activity of the business, it's

19 my understanding the most recent tax return that Mr. Medvedev

20 filed, which shows income from both the music business as

21 well as the car business, is about $100,000 a year.

22         I think Ms. -- Ms. Gurina shows income of about

23 $15,000, which comes solely from the music store -- music

24 business.  So that their annual income from the business is

25 in the one hundred to one hundred thirty or forty thousand

1    dollar range.

2         Other than just clothing, they simply have no other

3    assets other than what's in these various bank accounts.  I

4    don't know what those values are.  My guess would be there's

5    probably been freeze orders issued on a lot of these.  But I

6    don't think they have significant assets in any of these

7    accounts other than just operating funds.

8         I will say, however, that the company Car Cash

9    Title should have some assets in its accounts because it has

10   to, as I said, have capital in order to make these automobile

11   loans.

12        And I think the Government probably has already

13   realized this, and if not, they'll find out from me when I

14   say it.  One of the three owners or the three funders of that

15   business is the person who's probably the main person behind

16   all the money running through these bank accounts, meaning

17   that are alleged in the Indictment.

18        It's a childhood friend.  This man and that man

19   grew up in Stevastopol.  And this other man has remained in

20   Russia or Crimea, or wherever he is, and he helped by

21   investing in the Car Cash Title business.

22        So there may be some assets in there.  I don't

23   think there are more than -- I can't really put a number on

24   them, but there are enough to fund an occasional automobile

25   loan, is what I know.  So there could be more there, but I

1    think that's, you know, business money that really cannot be

2    accessed by the Defendant personally.

3                So the total picture is, I think, a family with

4    roughly in the range of $100,000 yearly income, with one

5    piece of property, the sort of accoutrement we all have in

6    living that kind of lifestyle.  That's my understanding of

7    the assets that he has.

8                And that the Court is right.  It's a whopper of a

9    lie on this other document.

10               THE COURT:  Okay.  Thank you.

11               MR. KISH:  Does that answer what you're asking,

12   Judge?

13               THE COURT:  Thank you, Mr. Kish.

14               MR. KISH:  Okay.  Yes, sir.

15               THE COURT:  Mr. Huber, as I've said to Mr. Kish,

16   obviously, the ability to access large sums of cash, there's

17   some astronomical numbers in the Indictment, in terms of what

18   has moved through the account.

19               What information do you have about this document,

20   the Government Exhibit 1?

21               MR. HUBER:  Yes.  So we -- we do know -- we have

22   seen -- the purchase of the $690,000 worth of gold, we have

23   seen communications --

24               THE COURT:  You have seen.  That's not -- that's

25   listed in here?

1    MR. HUBER:  That is not based -- that is not based

2    on this -- on Exhibit 1.

3          THE COURT:  That's what I wanted to confirm.  You

4    have seen a purchase by this Defendant of $690,000?

5          MR. HUBER:  We have seen communications between

6    this Defendant and the Singapore Precious Metals Exchange

7    reflecting a purchase of $690,000 of gold.

8          THE COURT:  Approximately when was that?  Within

9    the last year?

10         MR. HUBER:  We believe about within the last year.

11   Probably not within the last couple of months, given that it

12   comes from an email search warrant.  So it probably is not

13   immediately -- maybe not even this calendar year, given when

14   we would have received -- when we would have done the warrant

15   and gotten the information.  But probably within --

16   approximately within the last year.

17         So -- so we know he had that purchase, and then we

18   see the financial statement that says he has five million in

19   gold.

20         We do not see in the email exchange -- we have not

21   seen a purchase of $5 million worth of gold.  That doesn't

22   rule it out, but it does suggest, as Mr. Kish said, that the

23   five million of gold on the personal financial statement is

24   exaggerated in some way.

25         In addition to the personal financial statement,

1    Mr. Medvedev submitted his 2021 tax returns.  So not last

2    year, but the year before, his tax returns in connection with

3    that same application.  Those tax returns reflect a federal

4    adjusted gross income of $235,000, not $100,000.

5         That may have changed in 2022.  I don't have any

6    information on what his 2022 -- assuming he's filed those,

7    what his 2022 tax returns show.  But that, too, is in excess

8    of what -- what he apparently is acknowledging, as is the

9    $690,000 of gold.

10        The money he did keep -- it looks like

11   approximately half of one percent of the money that was

12   flowing through these accounts is about what he was

13   retaining.

14        There aren't eye-popping numbers in their personal

15   accounts.  I mean, it's not like there are tens of millions

16   of dollars that we have seen in their personal accounts or in

17   the Sound of Music, the business account.

18        So that sort of -- I mean, he certainly seems to

19   have more money than he's -- more assets than he's

20   acknowledging.

21        He's in contact with individuals who obviously have

22   absolutely astronomical assets.

23        And I think something that Mr. Kish said about the

24   fraudulent application that he submitted to Citizenship and

25   Immigration Services applies here.  I think Mr. Kish said

1  people are willing to take desperate steps to protect their

2  family.

3          And so he was saying Mr. Medvedev was taking a

4  desperate step to protect his father and, I think, half-

5  sisters in the Crimea.

6          I think the same can be said for what steps Mr.

7  Medvedev and his family will be willing to take when he's

8  facing guidelines of approximately a decade, plus or minus,

9  and that -- and so given the access, given a lifelong friend,

10  apparently, who has access to $160 million, the ability to

11  travel to a non-extraditable country of Russia -- his whole

12  family can travel there and -- and be citizens there, are

13  citizens or can be -- you know, get passports, I think does

14  mean that he is unable to -- we are unable to fashion

15  conditions that will assure his appearance.

16          And, again, it's not for lack of sympathy for his

17  wife, who -- who is apparently suffering a terrible illness.

18  I mean, that's not -- that certainly moves the pendulum

19  towards trying to think if there's some condition that would

20  -- would guarantee that he would be here, and, unfortunately,

21  we don't -- we don't see that.

22          THE COURT:  Thank you, Mr. Huber.

23          MR. KISH:  Could I respond to two points?

24          THE COURT:  Yes.  Yes, sir.  Glad to hear from you,

25  Mr. Kish.

1          MR. KISH:   Thank you.

2          And, again, this is kind of moving quickly.  I

3    grant that the Government got an Indictment.  They did the

4    search warrant, I know, and they seized a number of items at

5    the residence, which I have not seen and I haven't even

6    discussed with Mr. Huber.

7          But I know they got the computers, and I know from

8    talking to my client that you'll go to his computer and

9    you're going to see everything that he's done in the last

10   several years.

11         I don't hear the Government saying they've got any

12   records showing he owns the gold.  What I heard Mr. Huber say

13   was he saw communications relating to that.

14         So I think that's a little bit different than

15   somebody saying, "Aha, the Defendant owns a lot of gold."  I

16   don't know that we have that evidence yet.

17         Second --

18         THE COURT:   Mr. Kish, that's an important point.  I

19   understood him to say it reflected the purchase of $690,000.

20         Is that right, Mr. Huber?  And this is a personal

21   purchase?

22         MR. HUBER:   So -- right.  And I was trying to be

23   careful to distinguish between the $65 million purchases,

24   which don't appear to be gold that Mr. Medvedev has

25   personally, but the 690,000 did appear to be a personal

```
 1    purchase of gold.

 2                THE COURT:  Okay.

 3                MR. KISH:  But my subsidiary pointed out was while

 4    there may have been communications about that, I don't know

 5    that the Government has said to you anything that shows

 6    documents verifying the ownership of the gold by the

 7    Defendant.  There may have been discussions about it, but I

 8    don't know if they've seen that.  That's all I'm saying here

 9    today.

10                It may be a fine distinction, but I think it's one

11    worth remembering, because I haven't seen anything to that

12    nature.

13                THE COURT:  Mr. Huber is on his feet on that point.

14    I'm sorry to interrupt.

15                Let's just get to that point.  What, Mr. Huber?

16                MR. HUBER:  We do believe that the documents, the

17    emails we have seen reflect ownership by Mr. Medvedev of that

18    subset of gold, not -- again, a distinction between the

19    65 million, and held in Singapore rather than here is what --

20    is our understanding.

21                THE COURT:  Okay.

22                MR. KISH:  Could I have a moment to consult with my

23    client, please?

24                THE COURT:  Yes, sir.

25                MR. KISH:  Thank you.
```

1          (Discussion off the record.)

2          MR. KISH:  We think it's not true, and I'd like the

3    Government to prove it.  Quite frankly, I just don't think

4    it's accurate, but that's our position on that.

5          But more importantly, for purposes of the Court's

6    point here today, is that -- and I probably would make the

7    same argument if I was at Mr. Huber's table, which is the

8    Government keeps saying Russia, Russia, Russia, and people

9    with money.

10          And I know that the Government's not going to

11    concede, which is that people who then appear in front of the

12    Court who have no assets or know people with lots of money

13    are therefore entitled to bond.  It can't be that.

14          What we have here on the face of it is a white-

15    collar crime by someone who's never before been accused of a

16    crime, who has every reason in the world to stay within three

17    miles of his residence in Buford because of his wife and his

18    family, because of her medical condition.

19          I think that -- again, I do understand the

20    Government's point, but I think that there are conditions

21    that we can craft which assures that he'll be where he's

22    supposed to be.

23          I mean, I'll concede they'll be stringent

24    conditions, but I think that the Government has not overcome

25    the presumption that the Court can do so, and we ask you to

1    deny their motion.

2              THE COURT:  Thank you.

3              Thank you, Mr. Kish.

4              Mr. Kish, I'm not going to -- I'm sorry.  You can

5    go ahead and confer if you need to.

6              MR. KISH:  No, Judge.  That's fine.

7              THE COURT:  I'm not going to require you to answer

8    this question.  You've made a candid admission that the

9    Defendant made a false statement in support of the citizen

10   application.

11             This document, this personal financial statement is

12   addressed to the Citizens Bank of Georgia.  It's dated in

13   April, a little over a year ago, April 21, 2022.

14             Is it your -- and, again, you don't have to answer

15   this question.  That he just created this as a totally

16   fraudulent document or that it was submitted to the Citizens

17   Bank of Georgia at some point in time and it was just then

18   added to the package?

19             If the Government can answer that, I'll let them

20   answer it.

21             But you had made a candid admission this was a

22   false document submitted in support of that application for

23   his father.

24             Again, if you want to confer with him, you don't

25   have to answer my question.

1          MR. KISH:  I would like to confer for a moment if I

2     could, Judge.

3          THE COURT:  Yes.  Yes, sir.

4          And if the Government has any information about

5     that, I'm happy to hear from the Government.

6          MR. KISH:  Judge, here's what we can say about the

7     document.  I don't know about the header of it, which shows

8     the bank's name and address, whether that was something that

9     was just the header of a blank document or not.

10          We do concede that my client inserted the numbers

11     into the document and that the numbers are false.

12          THE COURT:  Okay.  Thank you, Mr. Kish.

13          Mr. Huber.

14          MR. HUBER:  And, Your Honor, we are not -- we don't

15     know one way or the other whether this personal financial

16     statement was prepared for the Citizens Bank of Georgia or

17     presented to the Citizens Bank of Georgia, either in this

18     form or another form.  So we don't know one way or the other

19     the answer to your specific question.

20          THE COURT:  But it was submitted under oath to the

21     United States government in support of the application for

22     his father and half-siblings?

23          MR. HUBER:  So, to be clear --

24          THE COURT:  Yes.

25          MR. HUBER:  -- there were two applications made by

1    Mr. Medvedev, I believe both for family members.

2            This particular application that had Exhibit 1A

3    attached only was seeking -- was -- only identified a single

4    person.  So it wasn't for all three, but I believe it was for

5    one of the three, just to be --

6            THE COURT:  Okay.

7            MR. HUBER:  But -- but, yes, it was attached to an

8    application for one of his -- I believe one of his relatives.

9    I believe it was his -- a sister.  The application actually

10   has a birth date of -- for the individual in the Uk- --

11   in -- in Stevastopol of February of 1986.  So I would suspect

12   that's a sibling rather than -- I mean, it can't be a father.

13           THE COURT:  Okay.  All right.  Thank you, Mr.

14   Huber.

15           So in this case, as has been pointed out, the

16   Defendant is charged with an offense that is a white-collar

17   offense.  It does not carry a presumption of detention.

18           And Mr. Kish has made some excellent points about

19   some connections he has here to Georgia, and the very sad

20   circumstances of his wife's ill health.

21           And while the Court is very sympathetic to that as

22   well as to the children, the amount of money that Mr.

23   Medvedev is charged with processing through these various

24   accounts shows a level of sophistication and access and

25   control over significant sums of money.

1    And then what begins to further complicate the

2    matter for him is the submission of a false financial

3    statement to the United States government that makes it

4    difficult for the Court to sort out exactly how much money he

5    does have and what he has access to.

6    The Government has represented this purchase of

7    gold, $690,000, within the last year.

8    He has significant incentive to flee, and he has

9    family who could go with him back to a place that the United

10   States could not extradite him from because of the ties there

11   and the connections -- the mentions of Russia, I think,

12   illustrate the depths of the ties there as related to this

13   offense.

14   At this time, based on what I have before me, I'm

15   going to order that Mr. Medvedev be detained pending trial on

16   these charges.  If there's any material change in the facts

17   or circumstances of this case, I would be willing to

18   reconsider.

19   But at this point in time, I think the point that

20   Mr. Huber made was important as Mr. Medvedev has demonstrated

21   a willingness to take drastic steps and to make false

22   statements when it came to trying to secure entry to the

23   United States of someone he cared about, and it persuades me

24   at this point that he might take drastic steps to remove

25   himself and his family from the United States.

1    And he's got a very -- experience in making

2  sophisticated transactions that would be hard to detect and

3  prevent, and the level of income that he appears to have

4  access to makes it more likely that he could pull that off

5  than a typical white-collar criminal.

6    So it is a tough case.  It's a close case, but I'm

7  going to rule that he should be detained and grant the

8  Government's motion at this time.

9    If there's nothing further, we'll be in recess as

10  to his case.

11    (Proceedings concluded at 2:22 p.m.)

12    - - - - - - - -

13    Reporter's Certification

14  I certify that the foregoing is a correct transcript from the

15  record of proceedings in the above-entitled matter.

16                              s/Diane Peede, RMR, CRR, CRC
                                Official Court Reporter
17                              United States District Court
    Date:  June 19, 2023       Northern District of Georgia
18

19

20

21

22

23

24

25